ORIGINAL

U.S. District Court

District of Delaware

Andrew E. Warrington

⅄

⅄

v.

⅄    Case Number: 1:06-CV-66

(GMS)

⅄

Carroll et al

⅄

⅄

Memorandum in Support of Petition Under 28 U.S.C. § 2254

For Writ of Habeas Corpus By A Person In State Custody

FILED

FEB 27 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

# Table of Contents

TABLE OF AUTHORITIES . . . . . . . . . . . . . 1

NATURE AND STAGE OF THE PROCEEDINGS . . . . . . . 2

SUMMARY OF THE ARGUMENTS . . . . . . . . . . . 4

STATEMENT OF THE FACTS . . . . . . . . . . . . . 6

ARGUMENTS:

I.    The petitioner was denied effective assistance of counsel . . 10

II    The petitioner was subjected to a faulty Grand-Jury indictment . 11

III   The prosecution was vindictive in nature . . . . . . 12

IV    The petitioner was convicted by way of inadmissable evidence . 13

V     There was insufficient evidence to support the conviction . . . 14

VI    The petitioner was subjected to Brady Violations . . . . 15

VII   The conviction was obtained through the use of . . . . 16
      out of court statements

VIII    The Jury Instructions were faulty    .    .    .    .    17

IX    Petitioner was denied counsel at Rule 61 Post Conviction    .    .    18
        Relief evidentiary hearing.

CONCLUSION    .    .    .    .    .    .    .    .    .    19

# TABLE OF AUTHORITIES

28. U.S.C. § 2254 . . . 3

U.S.C.A. Const. Amend 5 . . . throughout

U.S.C.A. Const. Amend 6 . . . throughout

U.S.C.A. Const. Amend 14 . . . throughout

## Nature And Stage Of The Proceedings

Petitioner is an inmate at the Delaware Correctional Center. On November 27, 2001, petitioner was convicted of one count of Murder in the First degree, one count of Possession of a deadly weapon during the commission of a felony (fireplace poker), and one count of Conspiracy in the First degree. On January 18, 2002, petitioner was sentenced to Natural Life plus Twenty-Five years. A notice of appeal was filed, a brief submitted, and petitioner was notified of its denial on March 10, 2003. On March 8, 2004, petitioner filed a motion for post conviction relief pursuant to Delaware Superior Court Criminal Rule 61. This motion was denied January 3, 2005, after which a notice of appeal to

the Supreme Court of the State of Delaware was filed

January 31, 2005. The appeal was denied on January 24,

2006. A timely petition under 28. U.S.C. § 2254 For writ

of Habeas Corpus was filed on January 24, 2006. This is

the petitioner's brief.

# SUMMARY OF THE ARGUMENTS

WHETHER THE PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

WHETHER THE PETITIONER WAS SUBJECTED TO A FAULTY GRAND-JURY INDICTMENT.

WHETHER THE PROSECUTION WAS VINDICTIVE IN NATURE.

WHETHER THE PETITIONER WAS CONVICTED BY WAY OF INADMISSABLE EVIDENCE.

WHETHER THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION.

WHETHER THE PETITIONER WAS SUBJECTED TO BRADY VIOLATIONS.

WHETHER THE CONVICTION WAS OBTAINED THROUGH THE USE OF OUT OF COURT STATEMENTS.

WHETHER THE JURY INSTRUCTIONS WERE FAULTY.

WHETHER THE PETITIONER WAS DENIED COUNSEL AT RULE 61 POST CONVICTION RELIEF EVIDENTIARY HEARING.

# STATEMENT OF THE FACTS

On August 14th, Jesse Pecco entered the house of Robert W. Warrington and Andrew E. Warrington. He was both uninvited and unexpected. The house, which was also the residence of their father, was a sanctuary that they valued greatly, and the location was unknown to others, (See App. 1).

The intruder was known to the defendants, and his reputation for violence was known as well. Of particular note was the gunfire on the Rehoboth Boardwalk that Mr. Pecco was involved in, (See App. 2).

Mr. Pecco first attacked Robert W. Warrington (Wes), who was of the habit of talking his way out of conflicts, (See App. 3). At this point, the intruder had already threatened Wes's life while on the porch of Peter Harlow's trailer, whose testimony of the event claims that the conversation was "about nothing", (See App. 4). Mr. Harlow also testified to the fact that Wes had just given him $500 to give to the future intruder, Mr. Pecco, (See App. 5). Mr. Harlow also testified to a meeting scheduled at a nuetral place, on Monday morning, in order to settle the supposed debt, (See App. 6).

Mr. Pecco would smuggle large amounts of ketamine while on "Vacation", (See App. 7). Mr. Pecco was arrested in Arkansas while smuggling "K", (See App. 8). Mr. Pecco desparately needed money to resolve his arrest, (See App. 9). Mr. Pecco's girlfriend, Ms. Wilson, testified that Mr. Pecco was deathly afraid of going to prison and was trying to raise the money to buy his way out of a long jail term, (See App. 10).

Just prior to the intrusion, the defendants smoked marijuana. Evidence to this fact was jokingly called "broccoli" by the prosecution, (See App. 11). Furthermore, the defendant's blood was drawn directly after the incident, (See App. 12). The results of the test for the time of consumption of marijuana have been omitted from the record.

The intruder attacked Robert W. Warrington. This is not the first record of such an incident. Mr. Pecco attacked his own mother, (See App. 13).

After Mr. Pecco attacked Robert W. Warrington while Robert attempted to talk to him, while in his own bedroom, Andrew ran down the stairs and saved his brother's life, (See App. 14). After saving his brother from being stabbed, Andrew was chased back up the stairs by the intruder, who refused to leave, (See App. 15). At the top of the stairs, Mr. Pecco ripped the knife, that Robert had disarmed him of in the bedroom, back out of Robert's hands and then proceeded to stab at Andrew, wounding his leg (See App. 16). Robert sustained multiple wounds all over his body, (See App. 17). The last knife wound happened at the top of the stairs, after Robert regained the knife and used it, (See App. 18). Robert fell down the stairs, wiping the minimal amount of blood on his hands onto the wall and handrail as he fell, (See App. 19). Mr. Pecco sustained wounds that for the most part bled internally, slowly leaching his strength, but not appearing too serious, (See App. 20).

None of the wounds that Mr. Pecco sustained were mortal, (See App. 21). Wes left his brother at the top of the stairs and ran to his bedroom to call 911. Wes yelled, "Police, Police!", as the intruder barged into his room, now aware that Wes was attempting to call for help, (See App. 22). During the struggle, Mr. Pecco kicked the bedroom wall, trying to stop Wes, (See App. 23).

Mr. Pecco had active, bleeding wounds on his hands, (See App. 24). The telephone that Wes used to call for help had three tiny spots of blood on it, (See App 25). There was no stain on the phone consistant with actively bleeding wounds.

The phone line was open during the closing of the argument. The defendants and the intruder were in the foyer, the Knife was in the bedroom. After the threat had ended, Wes asked Andrew to check to see if he had succeeded in calling for help, while at the same time picking up another phone to call for help. Out of habit, Andrew pressed the talk button, disconnecting them from 911. 911 called back immediatly, (See App. 26). The 911 operator did not identify himself, and thinking that his call for help had failed, as help had not arrived, Wes proceeded under the assumption that he was possibly talking to a customer of his father's Carpet Cleaning business, (See App. 27).

While running around trying to find his girlfriend, as well as trying to hide the marijuana paraphanalia, (See App. 28), Andrew finds the Knife on the bedroom floor. The Knife has Wes's blood on it at the top of the handle from a small wound on his right hand.

8

Andrew then hands the Knife to Wes, who later sets it down in the foyer so that the police can easily find it. The paraphanalia was hidden, the Knife was out in the open. Andrew left a print, in his brother's blood, at the bottom of the bedroom door, while on his quest to hide the paraphanalia, (See App. 29).

Wes was covered in blood on his clothes from the *close contact at the top of the stairs, (See App. 30). Later, Wes sat down on a leather couch, hyper-ventilating as he talked to 911, (See App. 31). A picture of that couch was introduced into evidence, (See App. 32). When the paramedics arrived, they did not try to save the intruder, (See App. 33). Wes was wearing a black sweatshirt, which EMS Myers took off of him and collected as evidence, (See App. 34). Later at the trial, while escorting him into court, the prosecutor asked the paramedic who had collected the most important piece of evidence, that had been mislabeled as belonging to Andrew, whether the sweatshirt that he had collected almost two years prior, was black or tan, (See App. 35). The black sweatshirt was never tested for blood stains on the back. The same paramedic was reluctant to admit that Wes was even wounded, (See App. 36). The officers at the scene caused 99% of the foot prints in blood on the floor, (See App. 37).

The brothers were questioned at Troop 7, Wes while naked except for a sheet, both while intoxicated on Marijuana, afterwhich they were released. Four days later, charges were pressed, and the brothers promptly turned themselves in to achieve vindication.

9

# ARGUMENT

## I. THE PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL

### STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether counsel's performance violated the petitioner's right to effective assistance of counsel, U.S.C.A. Const. Amend. 6.

Counsel failed to challenge the admissability of improperly collected evidence. Counsel failed to challenge the indictment, which was obtained by way of "fruit of the poisonous tree". Counsel failed to motion for change of venue, even in the face of massive pre-trial publicity. Counsel failed to motion to sever the trials, causing damage to the petitioner's rights. Counsel failed to prepare his client or his self for trial, as he was on vacation throughout Europe for the three months prior to trial. Counsel failed to examine the improperly collected evidence, or object to it. Counsel failed to object to the admission of a statement given while under the influence of marijuana. Counsel appealed from the standpoint that the petitioner willed the intruder's death, which is not true.

# ARGUMENT

## II.   THE PETITIONER WAS SUBJECTED TO A FAULTY GRAND-JURY INDICTMENT

### STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5, 14.

The petitioner has never seen evidence of a perfected indictment. The indictment used was obtained through the use of a statement made while under the influence of marijuana, as well as portions of a 911 calls, made by co-defendant Robert W. Warrington, that was altered to enhance the portions favorable to the prosecution.

# ARGUMENT

II.    THE PROSECUTION WAS VINDICTIVE IN NATURE

## STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law were violated, U.S.C.A. Const. Amend. 5, 14.

The initial instinct of the officers on the scene was that this was a "Criminal Killed by Private Citizen", (See App. 38). This instinct was correct. The prosecution failed to examine what would have happened had the petitioner failed to act. The vindictive nature of the prosecution, combined with the fact that it was virtually unopposed, lead to the civil death of an innocent man. The prosecution even went so far as to coach a witness.

# ARGUMENT

## II    THE PETITIONER WAS CONVICTED BY WAY OF INADMISSABLE EVIDENCE.

## STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5, 14.

An uncertified "expert" witness gave testimony. A statement given while under the influence of marijuana was entered on the record, and a piece of evidence remained untested where it was relevant because it was collected by a paramedic.

13

## ARGUMENT

V    THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT THE CONVICTION

### STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5, 14.

The encounter was sudden and unexpected. It was reasonable to believe that the intruder would inflict injury or death as he was shouting, "I'll kill you". The intruder was asked to leave and refused. This meets the criteria for Self-defense in one's own home. The home's resident attempted to call for help, and no intent to kill was shown. The intruder had very actively bleeding wounds on his hands, and could not have used the phone in question as it was virtually blood free.

14

# ARGUMENT

## VI    THE PETITIONER WAS SUBJECTED TO BRADY VIOLATIONS

### STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioners' right to due process and equal protection under law was violated. U.S.C.A. Const. Amend. 5, 14.

Prosecution failed to disclose material used in DNA testimony.

# ARGUMENT

VII    THE CONVICTION WAS OBTAINED THROUGH
THE USE OF OUT OF COURT STATEMENTS

## STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's
right to due process and equal protection under law was violated,
U.S.C.A. Const. Amend. 5, 14.


Testimony was given to notes that the witness did not
make, nor was present while being made, and the opportunity
to question the note taker was not presented.

16

# ARGUMENT

## VIII    THE JURY INSTRUCTIONS WERE FAULTY

## STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5, 14.

The jury was improperly instructed as to defense in ones own home.

17

# ARGUMENT

## IX    PETITIONER WAS DENIED COUNSEL AT RULE 61 POST CONVICTION RELIEF EVIDENTIARY HEARING

### STANDARD AND SCOPE OF REVIEW

The standard and scope of review is whether the petitioner's right to due process and equal protection under law was violated, U.S.C.A. Const. Amend. 5, 14.

. By denying the petitioner counsel, the state rendered its fact finding procedure inadequate to afford a full and fair hearing. A Federal evidentiary hearing would determine that the states determination is not supported by the record, and would resolve the dispute.

18

## Conclusion

In light of the aforementioned, petitioner requests an

evidentiary hearing be ordered so that the lower court decision

can be reversed and the case remanded.

Andrew E. Warrington
SBI# 00339043
Delaware Correctional Center
1181 Paddock Rd.
Smyrna, DE
                    19977

Dated: 2/22/06

19

ORIGINAL

U.S. District Court

District of Delaware

Andrew E. Warrington

      V.

Carrol et al

✳
✳
✳
✳
✳

Case Number: 1:06-CV-66

(GMS)

_Appendix to Petitioner's Memorandum_

FILED

FEB 2 7 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

R.Warrington – Direct       H–79

1   inside and got a bottle of Captain Morgan. I was

2   twenty-two, so I am old enough to drink.

3      Q   Did you ever have any discussion about

4   meeting Pecco at your house?

5      A   No. Never.

6      Q   Why not?

7      A   Well, for one thing, my dad's house is my

8   sanctuary. No one knows where it is. I mean, there is

9   a few people that might know I live in Port Lewes, but

10   as to which house it is, never, because there is a lot

11   of reasons.

12      For one, my dad's door is never locked, you

13   know. We are out working, and the front door is

14   unlocked, but all of our stuff is in there. It is a

15   safe neighborhood, but I didn't exactly trust all my

16   friends, you know.

17      Second of all, my dad's number one rule is no

18   one ever over to the house. He didn't even have people

19   over to the house. Missy might have come over, and

20   when my dad was dating Missy's mom, she came over, and

21   Drew's girlfriend is over there. You know, she's my

22   little sister. She is allowed over, but no one else

23   would be allowed over.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A – 1

R.Warrington - Direct                    H-30

1   bit?.

2          A      I was walking down the boardwalk toward the

3   pavilion.  There was a group of kids down at the

4   pavilion, and this kid named Fat Willie came up and

5   started giving me problems.  I was short; big hair;

6   glasses.  I was picked on a lot.  So he started giving

7   me problems, and then from behind me comes this kid who

8   has a baseball bat in his hand, threatening to kick my

9   butt for nothing.  Just the way the Rehoboth kids were.

10         Q      Who was it who came up?

11         A      Jesse Pecco.  The very first time I ever had

12  the misfortune of meeting him.

13         Q      Over the years, you came to know Jesse?

14         A      Yeah.  It is hard to be around Rehoboth and

15  not run into everyone at least a couple times.

16         Q      How did you know Jesse after that?  What was

17  your experience with him after that?

18         A      I was working in TCBY.  I don't know -- I was

19  walking home.  I was the night manager.  I was walking

20  home toward the bus stop the summer right before I went

21  to college, so the summer of '95.

22                I was almost to the end of the boardwalk and

23  I hear a pop.  Some kid got shot in the stomach, shot

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

$A - 2a.$

R.Warrington – Direct                    H-31

1      at the boardwalk, and here comes Jesse running by, and

2      Jesse has a gun in his hand and is yelling "Here's to

3      the motherf'n K."  There was a guy with a walkie-

4      talkie, and all hell broke loose.  I was stuck there

5      for a couple hours trying to get back to Lewes.

6          Q     Over the years, you had more exposure to

7      Jesse Pecco?

8          A     Yeah.  I did a year of U of D and I was

9      seventeen.  I was pretty young.  I decided to take a

10     year off.  I was trying to be a writer, and I really

11     didn't have anything to write about.  So I came home

12     and wanted to work for my dad.

13             So that summer I was working at the arcade

14     and working for my dad, and you make friends on the

15     boardwalk.  I made some friends.  They probably weren't

16     the best of friends, but they ran in the circle that

17     Jesse ran in, and kids named Bobby Brown, Jeremy

18     Stewart, and they had this -- like, would smuggle drugs

19     from Philadelphia down, and they would bring the drugs,

20     and it would be up to Jesse to give it to people to

21     distribute it.

22             I was hanging out with this kid named Jay.

23     Just knew him from the arcade.  And Jay would take me

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

$A-2b$

R.Warrington - Direct                       H-45

1    rational thought when he stepped in my house.

-2              My car was packed.  I was ready to go.  He

3    calmed my friends down.  I told him, "I will get you

4    the money when I can."  He said, "I need the money by

5    tomorrow or my little brother is going to shoot you."

6    I talked to him and he ended up helping me gather my

7    stuff, and I got in my car and drove away.

8         Q    How did you talk your way out of that?

-9        A    You know, just did.  You know, I guess he was

10   a rational person.  He didn't want violence to go down,

11   because violence doesn't get you anywhere.  You don't

12   get your money back when you beat somebody else up.

13   That's how I always looked at it.  Other people

14   probably don't.

15        Q    Well, you come back from Alabama --

16        A    Right.

17        Q    -- around Christmas of '99?

18        A    Right.

19        Q    Why did you come back?

20        A    Well, there is a lot of reasons I came back.

21   I missed my little brother a lot.  I hadn't seen him or

22   talked to him in a whole year, and when I finally did

23   call back, he told me anybody who was anybody, all the

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-2

```
 1       A    No.

 2       Q    Do you recall telling them Wes owed Jesse

 3   for a little while?

 4       A    Can you repeat the question, please?

 5       Q    Do you recall telling Detective Hudson that

 6   Wes had owed Jesse for a little while?

 7       A    Yes, sir.

 8       Q    You also recall saying that Jesse wanted to

 9   get paid his money?

10       A    Of course.

11       Q    During the exchange, at Pecco's mother's

12   house in the back house, you indicated on direct that

13   there was some conversation on the back patio,

14   correct?

15       A    Yes, sir.

16       Q    What was that conversation about?

17       A    Nothing.  Just nothing important at all.

18   There was nothing said until we went to the back

19   house.

20       Q    Then you went to the back house, and Wes

21   showed Jesse the check?

22       A    Yes, sir.

23       Q    And Jesse wouldn't let Wes keep that check,
```

HARLOW - Cross

1    receive it.

2         Q    Was he aggravated that he hadn't been paid?

3         A    To his knowledge, Wes was leaving the state,

4    and he wouldn't know if he would come back.

5         Q    Can you answer the question.  Was he

6    aggravated?

7         A    I'm sure he was.  He was a little upset.

8         Q    Did he appear aggravated to you about not

9    being paid?

10        A    There was no hostility between Jesse and Wes

11   ever.

12        Q    Wes owes this guy $1,400 bucks and he's not

13   aggravated?

14        A    I was unaware of the $1,400.

15        Q    Do you know how much it was, $800?

16        A    To my understanding.

17        Q    $800?

18        A    The only number I knew of was $800.

19        Q    Plus the five you had that Wes paid you to

20   pay to Jesse?

21        A    Yes.

22        Q    So that $500 was in addition to the $800

23   that you believe was owed?

HARLOW - Cross

— 1      A     I would suppose, yes.

— 2      Q     Well, you had already paid it, and he still

3     wanted the $800, correct?

4      A     Of course, yes.

5      Q     Do you recall telling Detective Hudson that

6     the contact between Wes and Jesse earlier that day

7     was about an hour?

8      A     That was a while ago, sir.  I'm not -- I was

9     only looking towards the important things of the

10     case.  I can't really answer that because --

11      Q     You don't recall telling that to Detective

12     Hudson?

13      A     No, I don't.  Well, there is so many things

14     I told Detective Hudson.  How am I supposed to

15     remember every last one of them?

16      Q     Were they the truth?

17      A     Yes, of course, they were.

18      Q     You can't remember the truth?

19      A     You know how long of a year I've had.  Put

20     yourself in my shoes for one second please, and then

21     understand that I'm sitting right here right now and

22     doing this.  Doing this for myself, for everyone

23     else, and I want you to keep with me here.  I told

HARLOW - Cross

1    BY MR. PHILLIPS:

2        Q    Do you recall making that statement?

3        A    No, I don't remember.

4        Q    Do you recall -- Page 10, Mr. Adkins --

5    Jesse telling Wes that Monday morning I will get up

6    with you, and we will go cash it?

7        A    Yes, sir.

8        Q    Do you recall that specifically?

9        A    Yes, sir.

10       Q    Monday morning?

11       A    Yes, sir.

12       Q    I want you to be absolutely clear.  You do

13   recall that specific?

14       A    Yes, Monday morning.

15       Q    I believe that you indicated on your direct

16   that there wasn't any -- that you don't know whether

17   they made any particular place to meet or not?  You

18   didn't know whether they did or not?

19       A    I remember Jesse saying I'll be at your

20   house Monday after the weekend, and they split, and

21   they never saw each other that weekend.

22       Q    You don't recall any conversation about

23   Southwinds Motel on the morning?

 1   not?

 2       A    In his what?

 3       Q    Ventures?

 4       A    Eventures?

 5       Q    In preparing drugs and dealing drugs, did

 6   she help him at all?

 7       A    No.

 8       Q    But she was helping cook it up that night?

 9       A    It's habitual thing.  It's not a business

10   perspective of it.  It was the personal favor.  You

11   could put that.

12       Q    She was helping him prepare the Ketamine for

13   sale; was she not?

14       A    Yes, sir.

15       Q    Would Jesse get his Ketamine when he went on

16   vacation?

17       A    Excuse me?

18       Q    Would Jesse get his Ketamine when he went on

19   vacation?

20       A    I would say so, yes.

21       Q    He would go on vacation to California,

22   Mexico?

23       A    Yes, sir.

C-98
HARLOW - Cross

1       Q    And come back with backpacks of Ketamine,
2   correct?

3            MR. ADKINS:   Can we approach?

4            THE COURT:   Sidebar.

5            (Whereupon, counsel approached the bench and
6       the following proceedings were had:)

7            MR. ADKINS:   I think our agreement has been
8   that the subject of drugs would be open as long as it
9   is relevant, but I don't get the relevance of, you
10  know, whether he got the drugs in Mexico, California,
11  or Alaska, or where he got them.   I don't understand
12  the relevance.

13           THE COURT:   Are we going any further?   If
14  so, what is the relevance?

15           MR. PHILLIPS:   The relevance is on one of
16  those vacations he was coming back and he got busted
17  in Arkansas.   This witness knows about that.   He was
18  due in Arkansas shortly after the event, and that is
19  why he needed the money.   I have a certified record
20  of the arrest.

21           MR. ADKINS:   Could we -- this is a little
22  loud.

23           MR. PHILLIPS:   Sorry.   I have a certified

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-8

 1      Q     And did he tell you what he got arrested

 2     for?

 3      A     Yes.

 4      Q     And what was that?

 5      A     199 bottles of Ketamine.

 6      Q     And did he ever tell you that he had some

 7     monetary concerns about that issue in Arkansas?

 8      A     Meaning what?  Excuse me?

 9      Q     Did that cause him some concern?

10      A     Of course, it was all the way across

11     America, and he had to go to court for it and

12     everything.

13      Q     Did he tell you as a result of that, he had

14     some money issues?

15      A     Yes.

16      Q     Did he tell you what those money issues

17     were?

18      A     They cost a lot for lawyers and just a lot

19     of money.  You know, when you get in trouble, the

20     more trouble you get, the more money it takes to get

21     out of it.

22      Q     He told you he needed money to deal with

23     that problem, didn't he?

A-9

```
 1       A     He needed money.

 2       Q     To deal with that problem?

 3       A     He told me -- I mean of course, yes.

 4       Q     And he was due back to deal with that

 5   problem shortly after August 14th, wasn't he?

 6       A     I wasn't aware of that.

 7       Q     He was in the midst of dealing with that

 8   problem during that period of time, wasn't he?  That

 9   problem was not resolved yet?

10       A     No, it wasn't, sir.

11       Q     And is that one of the things that you

12   reported to Detective Hudson was on his back at the

13   time?

14       A     To the best of my recollection, yes.

15       Q     You indicated that you had personal

16   knowledge of money fronted to Wes or Drew by Jesse

17   Pecco when Mr. Adkins was questioning you, correct?

18       A     Sorry.  Can you repeat that?

19       Q     You indicated, I believe, and correct me if

20   I'm wrong, that you had some personal knowledge of

21   drugs fronted by Pecco to Wes and/or Drew?

22       A     Yes, sir.

23       Q     Regarding marijuana?
```

C-134

1    bit of a pinch?

2        A    Yes.

3        Q    Correct, that summer.  You were familiar

4    with his problems in Arkansas; were you not?

5        A    Yes.

6        Q    And did he talk to you about those problems

7    in Arkansas?

8        A    Only that he knew he was in a lot of

9    trouble, and he had to come up with a lot of money to

10   pay off the fine.  Hopefully, just a fine and no jail

11   time.

12       Q    But he was worried about getting money,

13   correct?

14       A    Yeah.

15       Q    It was important to him that he get enough

16   money?

17       A    He wanted to walk in the court, into

18   wherever he had to go, in Arkansas with a handful of

19   money and offer to pay a fine.  He was scared of

20   jail.  He didn't want to go to jail.

21       Q    Are you familiar with what his problems were

22   in Arkansas?

23       A    Yes.

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-10

1   is showing basically the main crime scene inside,

2   which is the staircase, the foyer, and the

3   first-floor bedroom. I would like to begin it at a

4   time. 8:20 is the time on there, and then showing

5   that takes me forty minutes, and cut it off. Have it

6   marked as a court exhibit. It will never go to the

7   jury so that they see the boring stuff or anything

8   prejudicial.

9           There is also -- I specifically told

10  Mr. Haller and I'm sure he recalls it -- on the

11  video, there is something on the stand or speaker, TV

12  that -- please excuse my ignorance. It looks like a

13  piece of broccoli, and it may be marijuana, and I

14  don't know if it is marijuana. Mr. Haller told me as

15  long as you don't ask what the broccoli is. I don't

16  have a problem with it. So I think we have an

17  agreement, and I bring that to the Court's attention.

18         THE COURT: It's satisfactory for me if you

19  all work that out, and I will explain that to the

20  jury that they will not be getting a copy of this.

21  Can we have two monitors?

22         THE BAILIFF: I will set one on the podium

23  for you and two big ones, one for the jury, one for

MEDD - Direct

1    Whereupon,

2                   CHRISTINE SARAH MEDD

3    was called as a witness by and on behalf of the State

4    of Delaware and, having been first duly sworn, was

5    examined and testified as follows:

6    BY MR. HUME:

7        Q    Good afternoon, Ms. Medd.

8        A    Hi.

9        Q    By whom are you employed?

10       A    Excuse me.

11       Q    By whom are you employed?

12       A    Beebe Medical Center.

13       Q    And how long have you been at Beebe?

14       A    Since 1997.

15       Q    And what do you do at Beebe?

16       A    Registered nurse.

17       Q    And do you recall if you were working in the

18   early morning hours of August 15th, 2000?

19       A    Yes, I was.

20       Q    And did you have occasion to draw blood from

21   Wes and Drew Warrington?

22       A    Yes, I did.

23       Q    And do you recall who you drew blood from

CHRISTINE L. QUINN
OFFICIAL COURT REPORTER

A-12

1    jury room.  Thank you.

2              (Whereupon, the jury left the courtroom.)

3              THE COURT:  Hold on one second.  All right,

4    Counsel.

5              DIRECT EXAMINATION ON VOIR DIRE

6    BY MR. PHILLIPS:

7         Q.   Mr. Webb, have you ever heard of any

8    incidents, assaults or offensive touching-type

9    incidents involving Jesse Pecco?

10        A.   Yes, sir.

11        Q.   How many do you recall?

12        A.   I'm only aware of two.

13        Q.   When was that and what was that?

14        A.   I believe there was an assault.  I don't know

15   the specific date, but the year was, I believe, 1993

16   and it was just an assault, domestic, between he and

17   his mother.  Assault third.

18        Q.   Okay.  Who was the victim of that and who was

19   the perpetrator?

20        A.   The victim was his mother and the perpetrator

21   was the defendant -- was Jesse Pecco.

22        Q.   What was the other that you were aware of?

23        A.   The other, I believe it was an incident that

                      DAVID WASHINGTON
                   Official Court Reporter

                        A-13

R.Warrington – Direct                    H-103

 1    top of the blade part and it cuts my finger as I am

 2    trying to -- he is trying to reach around and stab me

 3    in the stomach. And he is yelling. He was really

 4    angry. He just flipped his lid. He was crazy.

 5        Q    What happens next? You are in the bedroom?

 6        A    We are in the bedroom, and he is kicking at

 7    the back of my leg, and we are struggling for the

 8    knife. And I back him up, you know, into the door of

 9    the bedroom. Out of nowhere comes this hit from

10    behind, and it was Drew.

11        Q    How do you know it was a hit from behind?

12        A    Because I could feel the impact. He was

13    behind me, and all of a sudden, something hit him from

14    behind. I don't know what Drew did, but he came, with

15    no second thought, to save me.

16        Q    And what happens?

17        A    I think Drew must have climbed on Jesse's

18    back, because the next thing I know, Jesse is letting

19    go of the knife and Drew is on top of Jesse's back.

20    But when Jesse is fully standing up -- because we were

21    kind of hunched over. He has a kind of weight on him,

22    I guess, crouched down. With Jesse standing up, Drew

23    is dangling. He is a little guy.

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

1       Jesse backs up a little bit and I got this
2   knife in my hands, and I just turn around and go like
3   this (indicating) blindly. Didn't even look where I
4   went. I don't know if I heard anything. I know Jesse
5   was crying out because Drew and Jesse is careening off
6   the walls, against this wall (indicating), and the wall
7   right by the front door, he slams Drew, and Drew lets
8   go and goes slumping to the ground.

9       So Jesse is standing right there. There's
10  the front door right by him. I mean, one step and he
11  could have left and went out the front door and nobody
12  would have stopped him at all. And that's exactly what
13  I wanted him to do, just leave.

14      Drew gets up. Looks like he's got the wind
15  knocked out of him, but he goes hauling up the stairs
16  and Jesse had taken a couple steps toward me and I am
17  standing there, and I got this knife in my hands, and I
18  am thinking, "You know, you are not going to hurt me."
19      When Drew goes running up the stairs, Jesse
20  goes running up after him and he yells out, "Come here,
21  you little bitch," and Drew and Jesse were up at the
22  top of the stairs when I came running around and I see
23  Jesse got Drew's legs.

1       Q.  Did you see any injury whatsoever to the

2    under side of his hands, the palm area and his

3    fingers?

4       A.   I didn't.

5       Q.   None?

6       A.   No, I don't recall.

7       Q.   Did you see any injuries to the other sides

8    of his hands, the front of his hands?

9       A.   No, I don't recall any injuries.

10      Q.   In fact, how many injuries did you find to

11   Drew Warrington?

12      A.   Just the single injury, the laceration.

13      Q.   Approximately where was that?

14      A.   It was his right lower leg, just superior to

15   the ankle on the outer side, the lateral portion.

16      Q.   How long was that laceration?

17      A.   Five centimeters.

18      Q.   What kind of treatment, if any, did you do to

19   that?

20      A.   I repaired it with one open Nylon running

21   stitch.  A running stitch is used oftentimes for a

22   very clean wound, very straight that the wound edges

23   are easily approximate.  The running stitch is through

DAVID WASHINGTON
Official Court Reporter

PORTZ - CROSS

1    the right breast you indicated -- I don't recall if

2    you said one or two identifiable injuries?

3         A.    There were three identifiable injuries on the

4    torso.

5         Q.    I'm talking about the upper, under the

6    breasts?

7         A.    The chest area, one.

8         Q.    There are two lower on the abdomen?

9         A.    Correct, yes.

10        Q.    Multiple abrasions on the knee?

11        A.    That's correct.

12        Q.    Would you be able to guess as to how many

13   abrasions on the knee?

14        A.    There were a lot and they were, you know,

15   really sort of, in some respects, fused together.  It

16   was maybe difficult to isolate.

17        Q.    It would have been difficult to count,

18   correct?

19        A.    Yes.

20        Q.    But those were clearly identifiable injuries,

21   correct?

22        A.    They were noted on the sheet, yes.

23        Q.    They are not something that's in anybody's

R.Warrington - Direct                    H-114

1    foyer, unlocked, which is beckoning for him to leave.

2            I wanted him to leave so bad and a lot

3    through the conflict, I said, "Get the hell out of

4    here."  I remember Drew saying, "Why don't you get the

5    fuck out of here."  But he never left.

6        Q    When was the last time the knife was used?

7        A    The last time the knife was used was up at

8    the top of the stairs when I stabbed him above the eye.

9        Q    What did you do with the knife?

10       A    Well, it had been on top of the speaker when

11   the speaker fell over when I was on the phone with the

12   911 operator.

13       Q    What did you do with the knife?

14       A    What did I do with the knife?  When I put it

15   on top of the speaker?

16       Q    You said you had it on the steps.  What

17   happens after that?

18       A    When I fell down the steps, I ran into the

19   bedroom and I put it on top of the speaker.

20       Q    When was the next time you touched that

21   knife?

22       A    It was when the 911 operator asked who has

23   the knife, and I had been sitting on the couch, you

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-18

 1    that with 41.  In going through the demonstration

 2    that you made to the jury, what, if any, results

 3    were you able to obtain?

 4         A     It was determined that the latent

 5    impression found on the specimen is an impression of

 6    the suspect's left palm, hypothenar zone, which is

 7    the outer area of the palm.

 8         Q     So on 41, the wooden handrail at the base

 9    of the stairs, you were able to determine to a

10    degree of certainty in your field that that is a

11    palm print of Robert Wesley Warrington?

12         A     That is correct.

13         Q     And that was in what appeared to be blood

14    to you?

15         A     Yes, it was.

16         Q     Did you conduct an examination on a section

17    of wallboard for the right of the sofa?  Court's

18    permission to approach.  Forty-two.

19              THE COURT:  Yes.

20    BY MR. GELOF:

21         Q     Mr. Hegman, I'm going to approach you with

22    what's been marked and admitted into evidence as

23    State's 42.

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A-19

1        Q      That answers the question.   Thank you.

2                    CROSS-EXAMINATION

3     BY MR. PHILLIPS:

4        Q      Good afternoon, Doctor Tobin.

5        A      Good afternoon.

6        Q      You indicated that you couldn't tell where

7     the various wounds occurred, correct?

8        A      I couldn't tell the order.   I mean they

9     were all sustained in the same general time.   But I

10    can't say if this was first, that was second.

11       Q      Now, on your direct examination, you

12    indicated that there were 100 cc's of blood in the

13    pericardial sac, and 800 cc's of blood in the right

14    pleural cavity.   Is that correct?

15       A      One seventy-five in the left pleural

16    cavity, I think.

17       Q      Is there any significance to that?   What

18    would be the significance of those?

19       A      Well, the significance is that's the

20    internal hemorrhage that I was talking about, this

21    hemorrhage.   It's probably from the heart wound into

22    the right pleural cavity, hemorrhage from the wounds

23    to the two wounds in the left lung into the left

A-20a

 1    pleural cavity, and hemorrhage in the pericardial

 2    sac from the heart.

 3         Q    And that's a lot of blood internally,

 4    correct?

 5         A    Well, I could tell you exactly what it was.

 6    His blood volume probably was between five and

 7    6,000.  And if we add all that up, that's getting up

 8    there around 2,000.  And then if you look at the

 9    blood at the scene and see the pictures, that

10    easily --

11         Q    A whole lot more?

12         A    Half of his blood volume, or a third.  A

13    third to a half, and that certainly would kill him.

14    That's why I said the one heart wound -- I mean it

15    was a sum of all the wounds that caused it.

16         Q    I understand that.  I guess my question is

17    how much blood was found internally in these three

18    parts of the body that you talked about?

19         A    Okay.  You add --

20         Q    There was 800, 100 --

21         A    Do you want me to add it?  I'm not going to

22    do it in my head, but I'll do it.

23              THE COURT:  Doctor --

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A-20b

1    his hands.

2         Q    And there was one wound that you referred

3    to as Wound No. 7?

4         A    Yes.

5         Q    And this was a wound wherein the knife went

6    into his heart?

7         A    Yes.

8         Q    Now, would that normally be a mortal wound

9    in and of itself?

10        A    It could be.  The thing is that he bled so

11   severely from all the other wounds, I felt that the

12   heart wound could have killed him, but not quite

13   that fast.  I mean if you imagine a pin cushion with

14   all these wounds -- I mean that's what it was like

15   really.  So he had severe bleeding from, you know,

16   many wounds.

17        Q    Well, let's just say Wound No. 7 and

18   nothing else.  Is he going to bleed to death?

19        A    He could eventually, but not as soon.

20        Q    Not as soon?

21        A    Right.

22        Q    But he would have eventually bled to death

23   from --

R.Warrington - Direct          H-110

1  and I didn't know if I got through to them, because all
2  I could do is call, "Police, police."

3        And before, there had been like a predatory
4  look in his eye and he was smiling. The smile stayed
5  there, but the look in his eye changed like he was
6  afraid of the police more than anything, more than me.

7        So the phone gets knocked out of my hand as I
8  am pushing him back toward the door, and for some
9  reason, he doesn't want to leave that bedroom. And I
10 am pushing him back up against the part right next to
11 the door, and I think I had to, like, kick the door to
12 open it with the bottom of my foot, nudge it with my
13 foot, and I pushed him out of the bedroom. I pushed
14 him pretty far back.

15       I don't know if he hit the front door or not,
16 but I pushed him until he was far away from me, and
17 Drew was standing over by the stairs. And as soon as I
18 pushed him, Drew saw us struggling, and Drew comes up
19 behind him and whacks him with the fireplace poker.

20  Q    And the number of seconds from the time the
21 phone is knocked out of your hands?

22  A    From the time the phone is in my hand until
23 the time Drew is hitting him, it was like that

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

$\Lambda - 77$

1      as 1646?

2          A     Yes, it is.   That's one section of

3      wallboard from the wall right of sofa, first floor

4      bedroom.

5          Q     Can you testify to a degree of certainty

6      that Court Exhibit 42, which is 1646, the section of

7      wallboard right of sofa, was the footwear impression

8      of Jesse Pecco?

9          A     The latent impressions were consistent to

10     the size, shape and style of K1, which are the shoes

11     of Jesse Pecco, the inside toe area of the right

12     shoe.

13         Q     If I could approach.  Mr. Hegman, I'm going

14     to hand you what's been admitted into evidence as

15     State's 14 and ask you if you're familiar with it.

16         A     Yes.   I received this footwear on August

17     29, year 2000, 1145 hours in the morning.

18         Q     It appears to be a Nike shoe?

19         A     Yes.   It has markings of a Nike shoe, yes,

20     sir.

21         Q     Now, in reviewing what appears to be a Nike

22     shoe to me, is that always the case in the course of

23     your examination?

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A-73

1    fingernails?

2        A    Well, he had wounds on his fingers.  Is

3    that what you mean?

4        Q    Were his nails short or were they long?

5        A    Okay.  Just a second.  Very short.  We did

6    do scrapings though, I'm sure.

7        Q    So you think scrapings were taken from the

8    fingernails?

9        A    I believe so, yes.

10       Q    And that would have been taken when he was

11   with you?

12       A    Yes.

13       Q    And what would be the purpose of taking the

14   scrapings?

15       A    To see if we find anything under the nails

16   that could belong to somebody else, you know, DNA

17   studies.

18       Q    I see.  Now, he had a lot of wounds?

19       A    He had what?

20       Q    A lot of wounds.

21       A    Yes.

22       Q    And he had 13 stab wounds?

23       A    Yes.  Not counting the incised wounds on

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A-24

1        A    Based on the DNA typing, K1, which is the

2    blood sample from Pecco, is the source of the DNA to

3    a reasonable degree of scientific certainty.

4        Q    How about a second sample Q11-2, could you

5    point out and describe where you took that sample

6    from on the phone?

7        A    Yes.  It's -- this one I have to refer to my

8    notes for exactly where that stain is located.

9    Q11-2, the second stain that was sent for DNA typing,

10   was taken from this area, top of the phone by the

11   antenna (indicating).

12       Q    Were you able to conclude who would be the

13   source to a reasonable degree of scientific certainty

14   to that DNA?

15       A    Yes, K1, which is Pecco's, is the source of

16   DNA to a reasonable degree of scientific certainty.

17       Q    And the third sample from the phone, Q11-3,

18   would you describe the location of that?

19       A    This was taken from the base of the phone by

20   the serial number and through this area (indicating).

21       Q    And did you conclude who would be the source

22   of the DNA as to that sample?

23       A    Yes.  Based on my results, K1 is the source

                    CHRISTINE L. QUINN
                  OFFICIAL COURT REPORTER

                      A-25

GOLDBERG - CROSS

1    Q.   So you can't recall if you were -- if you

2  gave a response to that, I take it?

3    A.   No, sir.

4    Q.   You also indicated there was no time in

5  between the time from when the phone hung up until you

6  immediately tried to call back?

7    A.   There was no time.

8    Q.   You immediately called back, correct?

9    A.   As soon as the phone was disconnected, I

10  depressed the next line available and called it.

11    Q.   Did you have to punch the numbers or did it

12  have an automatic redial to the number just

13  disconnected?

14    A.   I had to punch the numbers.

15    Q.   So you immediately punched the next line and

16  dialed the numbers?

17    A.   The numbers provided to me by the 911 screen.

18    Q.   In a matter of seconds?  Are you able to tell

19  how long it took to call back?

20    A.   Less than --

21    Q.   Ten seconds?

22    A.   Less than five seconds probably.

23    Q.   And someone immediately picked up the phone?

DAVID WASHINGTON
Official Court Reporter


A - 26a

1        A. ' Yes, sir.

2        Q.   After how many rings, do you recall?

3        A.   It was pretty quick.  It was less than three

4   maybe.

5        Q.   During the second call you were having a

6   conversation with somebody, correct?

7        A.   Yes, sir.

8        Q.   And that open phone conversation gets a

9   little bit difficult, you are asking questions, the

10  responses aren't that great; do you recall that?

11       A.   Yes, sir.

12       Q.   You figured you were having a little bit of

13  difficulty communicating with that person at that

14  time?

15       A.   It was a caller that was pretty excited as

16  the questions went on, yes, sir.

17       Q.   Did you hear heavy breathing, some

18  hyperventilating, those types of things is what you

19  hear?

20       A.   Yes, sir.

21            MR. PHILLIPS:  Nothing further.  Thank you,

22  Mr. Goldberg.

23                    CROSS-EXAMINATION

DAVID WASHINGTON
Official Court Reporter

 A-26b

R.Warrington - Direct          H-124

1          A     It was right to the right of the left speaker

2     on a pile of clothes in front of the bedroom door.

3          Q     All right.

4          A     As he ran into the bedroom, I saw the black

5     unit of the phone on the table, so I stepped forward

6     and grabbed the phone, and he went in and I heard him

7     say, "Hello," and I saw him press the button, and he

8     looked at me and said, "There is nobody there."  So my

9     intention was to call 911 with the black phone, and the

10    phone rang.  I didn't know who it was.

11         Q     It has caller I. D. on it?

12         A     Right.  I immediately pressed the talk

13    button.

14         Q     You didn't check to see who the caller I. D.

15    was?

16         A     No.  I wasn't thinking about that.

17         Q     Now, you answered the phone, and tell us why

18    you answered the phone the way you did?

19         A     I didn't know who it was.  It could have been

20    one of dad's customers.  It could have been anyone.

21         Q     What did you think when the person --

22         A     Well, they didn't say who they were.  So at

23    first, they asked me what my name was and I told them

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-27

1       A     Yeah.  I know I said, "This guy.  This guy
2   named -- this kid named Pecco," or, "I think his name
3   is Jesse."  But right now if I was on the phone talking
4   to him, yeah, I could pronounce it and tell him
5   everything, but at the time, it was tough.

6       Q     And what is going on while you are talking to
7   911 on the phone?

8       A     At first, Drew was in the foyer with Jesse.
9   I don't know what went on there.  And then Drew came
10  running into the bedroom and he saw me sitting on the
11  couch.  And then Drew ran up and I am talking to the
12  911 operator and he asked me something about who has
13  the knife.

14            And I stood up and I went and I found the
15  knife, and I was pacing back and forth.  And then Drew
16  came back downstairs, and there was -- I mean, he had a
17  bong in the bedroom.  He had some weed.  He just
18  started running around trying to hide that stuff.

19      Q     And what are you doing at this point?
20      A     I am talking on the phone to the 911
21  operator, and I step out.  Drew goes running past me.
22  He goes running upstairs to stash the bong upstairs,
23  and I step out into the foyer and I seen him on the



 1      A     No, I do not.

 2      Q     But were you able to examine this section

 3   of State's 37, the door?

 4      A     Yes.

 5      Q     And the prints that you found on State's 37

 6   were both on this section?

 7      A     Yes.

 8      Q     So the section with the swirl is the same

 9   section -- the view of the door with the swirl on

10   the back, is the same section where the two prints

11   came from, Jesse Pecco's and Andrew Warrington's?

12      A     That was in lieu -- almost near the knob of

13   the opening of the door in that area.

14      Q     Is where Jesse Pecco's thumb print was

15   found?

16      A     Yes.

17      Q     And that was also in a substance that

18   appeared to be blood?

19      A     It was further enhanced with a chemical

20   that we use for blood, amino black. It's the

21   chemical that I used to further enhance it.

22      Q     And that was the same with the right ring

23   finger of Andrew Warrington and also identified

 1    within the interior of the door?

 2         A    It was identified, yes, in the interior of

 3    the door.  Yes.

 4         Q    And that was in a substance consistent with

 5    what appeared to be blood?

 6         A    It was in a reddish substance.

 7         Q    So just so I'm clear, you don't have the

 8    expertise to say if that reddish substance was blood

 9    or not blood?

10         A    That's correct.

11         Q    But you can say that the print was not a

12    print that was there, and then this red substance

13    came on top of it, is that correct?

14         A    That's correct.

15         Q    So whatever caused that print, had the red

16    substance on it and then transferred it to the door?

17         A    That's correct.

18         Q    And that would be the same as applied with

19    the thumb print of Jesse Pecco also found on the

20    interior of the door?

21         A    Yes.  That's correct.

22         Q    And did you also examine the entire

23    interior of the door to see if there were any prints

                    KATHY S. PURNELL
                 OFFICIAL COURT REPORTER

 1    be blood?  It was in a red substance?

 2         A    It was in a red substance.

 3         Q    So again that means that whatever created

 4    that palm print, had that red substance on it when

 5    the print was made?  This is not a print that could

 6    have been on the door at sometime prior and then

 7    that substance is attached to the door?

 8         A    No.  It appears that it's -- well, as you

 9    can see, it pulls down like a smudge.  No.

10         Q    Thank you, Detective.  And just again,

11    before the door gets turned around, the area -- now

12    that we have a laser pointer, if you could use the

13    laser pointer and show the approximate area where

14    Jesse Pecco's thumb print was found.

15         A    (Witness indicating.)

16         Q    Now the area where Andrew Warrington's

17    fingerprint was found.

18         A    In this area (indicating).  I have to get

19    down to see that particular one, but it should be

20    between this area here.

21         Q    Okay.

22              THE COURT:  Are you all done with the door

23    for now, for the moment?

                    KATHY S. PURNELL
                 OFFICIAL COURT REPORTER

                                        A - 29c

1    bottom of your report here, right there where I

2    highlighted it.  If you can use that to refresh your

3    recollection.

4           THE COURT:  Read it to yourself, sir.

5           MR. PHILLIPS:  Yes, sir.

6    BY MR. PHILLIPS:

7       Q.   Does it help you to recall whether you saw a

8    cut on the left side of Wesley's head or not?  That is

9    your report?

10      A.   Yes, it is my report.  I put on it he had

11   been making motions with his left hand to the side of

12   the head.  There was a great deal of blood there.

13   Honestly, I can't tell if I remember seeing any skin

14   flap.  It might have been my assumptions there was a

15   cut because the cut, I know head wounds bleed a great

16   deal.  I can't honestly tell if I saw exposed skin.

17      Q.   But that's what you put in your report?

18      A.   That is what I put in my report.

19      Q.   With regard to the blood that you saw when

20   Drew and Wesley came out, Drew had some blood on him,

21   correct?

22      A.   That's correct.

23      Q.   Wesley had a lot of blood on him, correct?

                    DAVID WASHINGTON
                 Official Court Reporter

A-30a

—1        A.   As I recall, yes.

2         Q.   That was on the front of him, on the back of

3    him, pretty much covered him?

4         A.   I didn't see their backs too much, to be

5    honest, but the front and sides.

6         Q.   Are you saying you do not recall or there

7    wasn't blood on the back of Wesley?

8         A.   Honestly I don't even remember looking at

9    their backs.  I was looking at them from the front.

10        Q.   Did you ever find or did you ever see the

11   broken handle end of the fireplace poker?

12        A.   Yes.

13        Q.   Where did you find that?

14        A.   It was in the back room off the foyer on the

15   first floor.

16        Q.   One end I know was found there.  Is that

17   where both ends were found?

18        A.   What I saw was the poker and it looked like a

19   wooden handle.  It was my observations that the wooden

20   handle part of the poker, it was laying about a foot

21   away from the poker.

22        Q.   So you saw the handle and the poker?

23        A.   Right.

R.Warrington - Direct                          H-125

1   my name, and then I could hear, you know, Jesse in the

2   background like saying something, moaning, and I don't

3   know.

4            They asked me what was going on, and I said,

5   "That's just my brother playing around," talking about

6   the noise in the background. They said, "We had an

7   open line the whole time. We heard everything."

8   Then I realized this is 911. This is the people I need

9   to help me.

10       Q    Then what happened?

11       A    Then I started to tell them what happened.  I

12  was trying to get it out, you know, and let them know

13  what was going on. But at the same time, blood was

14  rushing to my head. I was thinking about a thousand

15  things at one time. I felt like I was going to pass

16  out. The smell, it was pretty bad in my nose.

17           So I had to sit down. And he was asking me

18  questions and I was answering him. But at the same

19  time, I wasn't really thinking about him either. I

20  wasn't thinking about the guy talking to me on the

21  phone.

22       Q    Do you remember their asking, "Who is it?,"

23  and that sort of thing? "Who is in your house?"

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER

A-31

Marvel - Cross                          D-153

1       Q    I was not very good in statistics, but

2    hopefully you get enough of a sample so it can be

3    statistically correlated to the scene; correct?

4       A    Correct.

5       Q    But let's just use, for example, that couch.

6       A    Okay.

— 7      Q    There was a fairly big stain on that couch;

8    correct?

— 9      A    Yes.

10      Q    And you took just a small sample from the top

11   right-hand corner.  Those swabbings were moistened with

12   the distilled water, and then rubbed over that large

13   area because it appeared that that originated from the

14   same source.  So you took that one on a big area?

15      A    Correct.

16      Q    Now, on the walls, there was a splatter of

17   blood here, a splatter of blood there.  You weren't

18   able to get all those splatters; correct?

19      A    No.

20      Q    Not even most of those splatters?

21      A    There was a not a lot left; correct.

22           MR. PHILLIPS:  May I have State's Exhibit No.

23   70, please?

EILEEN G. KIMMEL
OFFICIAL COURT REPORTER


A-         32

1    Q.  'There was no resuscitation that was, in your

2  opinion, possible at that time.  What did you do?

3    A.  At this point we have to contact the medical

4  control facility.  We use Nanticoke Memorial Hospital

5  for contact at this point and the emergency room

6  physician that I speak with on the phone or by radio,

7  give him a scene, I size up basically a picture of the

8  scene of what we are dealing with and get the medical

9  control physician's approval for a pronouncement of

10  death.

11    Q.  Did you relay to him the significant

12  observations that you said that you had in front of

13  you at that point?

14    ·  A.  Yes, I did.

15    Q.  Based upon that relay, what was your next

16  action?

17    A.  The doctor at the time agreed with my

18  observations of the scene and determination and agreed

19  to what we have is called a DOPA:  Death upon

20  paramedics' arrival.  We made a pronouncement at, I

21  believe, 1423 hours.

22    Q.  Do you have a copy of your report there with

23  you?

A-33

1    admitted and I will so rule in front of the jury.

2              (Whereupon, counsel returned to the trial

3         table and the following proceedings were had:)

4              THE COURT:  Madam Clerk, the last two items

5    for identification from the State will be admitted as

6    the next two sequential numbers.

7              THE CLERK:  State's H for Identification is

8    now admit as State's 7; State's I for Identification

9    is admitted as State's No. 8.

10             MR. HUME:  Your Honor, I have no further

11   questions for Lieutenant Slater.

12             THE COURT:  Mr. Phillips, any other questions

13   of the officer?

14             MR. PHILLIPS:  Yes, Your Honor.

15             THE COURT:  Proceed.

16                    RECROSS-EXAMINATION

17   BY MR. PHILLIPS:

18        Q.   Did anybody assist you with this collection

19   process?

20        A.   Yes, sir.

21        Q.   Who was that?

22        A.   I think one of the paramedics at the scene

23   helped me remove some of the clothing.


                    DAVID WASHINGTON
                 Official Court Reporter

                    A-           34

1      Q.    .Do you remember which paramedic that was?

2      A.    I believe it was Paramedic Jay Myers.

3      Q.    When you got there, is it fair to say that

4      one of the individuals that came out of the residence

5      had more blood on them than the other?

6      A.    Yes, sir.

7      Q.    Who had more blood than the other?

8      A.    Wesley had more blood than the other.

9      Q.    You were looking at those sweatshirts.  Which

10     sweatshirt had more blood on it?

11     A.    The lighter colored one.

12     Q.    You think the lighter colored one did?

13     A.    I believe it did, yeah.

14     Q.    That gray phone you obtained, that had blood

15     on it as well, correct?

16     A.    Yes, sir.

17     Q.    Both of us looked at it.  It had blood on the

18     handle and smeared in different places on that phone;

19     is that correct?

20     A.    Yes, sir.

21     Q.    And Wesley had that phone in his hand?

22     A.    Yes, he did.

23     Q.    When you entered, the individual lying on the

DAVID WASHINGTON
Official Court Reporter

A-PRAR 34b

1        Q.    Things that need emergency treatment?

2        A.    That is correct.

3        Q.    Most bruising, abrasions, scratches, those

4   aren't the type of things in the normal course of your

5   work that require emergency treatment; is that

6   correct?

7        A.    No, sir, but once the rapid trauma is

8   completed, he was back boarded. A second or focussed

9   history is done on the patient and those are addressed

10  at that time.

11       Q.    Prior to your getting on the stand here

12  today, did you have any conversations with the

13  prosecutor regarding the color of the sweatshirts?

14       A.    I was asked by Mr. Hume whether if I recalled

15  the shirts and who was wearing what.

16       Q.    And did you recall on your own at that time

17  or did Mr. Hume give you any information with regard

18  to that?

19       A.    My answer to Mr. Hume was, as I testified, I

20  just recalled one was lighter than the other and

21  Robert was wearing the lighter of the sweatshirts.

22       Q.    You didn't need any help remembering that?

23       A.    No, sir, I did not.

DAVID WASHINGTON
Official Court Reporter

A - 35

1    respiratory-type thing.  Your breathing is basically

2    part of keeping your body alive, which means that if

3    your body calls for more oxygen, your brain causes

4    your body to start breathing faster until the proper

5    amount of oxygen gets there.  In other words, your

6    body compensates for outside things that happens to

7    you.

8         Q.   You also made a note he had a rapid pulse,

9    correct?

10        A.   Yes, sir.

11        Q.   Is there a significance to that finding?  Is

12   that similar to breathing?

13        A.   Yes, sir, it is almost exactly.  When the

14   body is trying to compensate, when it's not getting

15   enough oxygen, the heart pumps faster so more

16   oxygenated blood gets where it needs to be.

17        Q.   Excitement can cause that?

18        A.   Yes, sir.

19        Q.   As well as a variety of other medical

20   ailments?

21        A.   Yes, sir.

22        Q.   With regard to your report, you stated you

23   found nothing, but your report indicates you found

                    DAVID WASHINGTON
                 Official Court Reporter



—1    scratches, abrasions to the left side of his face and

  2    skull; is that correct?

  3          A.    No, sir, I don't believe so.

  4                MR. PHILLIPS:  Your Honor, may I approach?

  5                THE COURT:  Yes.

  6    BY MR. PHILLIPS:

  7          Q.    I will show you what I believe is your

  8    report.  I point to the head and face section.

  9          A.    You are correct.  I am wrong.  I did document

 10    there were scratches and abrasions that were

 11    non-bleeding in his facial area.

 12          Q.    And the skull?

 13          A.    The same, in the hairline.

 14          Q.    You also found a scratch to his upper left

 15    thigh area?

 16          A.    That is correct.

 17          Q.    So when you previously said you found

 18    nothing, that's not exactly accurate, you found a

 19    little something, correct?

 20          A.    Yes.  Nothing that was life threatening.

 21          Q.    That's what you are mostly checking for, life

 22    threatening?

 23          A.    Yes, sir, that is correct.

                        DAVID WASHINGTON
                     Official Court Reporter

                     A-WNN 36b

Marvel — Direct                              D-138

 1    molding?

 2         A      Yes.   It runs all the way down to the floor

 3    (indicating).  A lot of blood in this location

 4    (indicating).

 5         Q    State's Exhibit 59?

 6         A      This is a Polaroid photograph of that same

 7    door molding.   There is the interior of the bedroom

 8    (indicating), and this is the sofa next to the bedroom

 9    door (indicating).

10              MR. ADKINS:  Would it be all right if

11    Mr. Gelof, since he has better eyes than me, read the

12    numbers and put them in while I ask Detective Marvel

13    the questions?

14              THE COURT:  I don't have a bit of problem

15    with that.

16              MR. GELOF:  60.

17    BY MR. ADKINS:

18         Q    What is that?

— 19        A      This is the vinyl flooring in the kitchen

20    (indicating), and this is the ruler that I have

21    described earlier (indicating).  Just to the right,

22    this is what I described as a partial shoeprint in what

23    I described as blood (indicating).  And the direction

                    EILEEN G. KIMMEL
                 OFFICIAL COURT REPORTER

A-ꟷꟷ 37a

- 1    of travel is repetitive transfer from the stairwell

  2    coming up to the first floor and going toward the

  3    refrigerator in the kitchen (indicating).

  4         Q    What do you mean by "repetitive transfer"?

  5         A    Repetitive transfer is when you have

  6    something on the bottom of your shoe and on each step

  7    there is less and less of it. It starts out there

  8    (indicating). On the carpet going into the kitchen, it

  9    is more prevalent. As it goes away, you see less of

  10   it.

  11        Q    And do you recall how many shoe impressions

  12   in what appeared to be blood are there that go across

  13   that kitchen floor?

  14        A    I recall at least four.

  15             MR. GELOF:  61.

  16             THE WITNESS:  Again, this is the vinyl floor

  17   in the kitchen on the second floor.

  18   BY MR. ADKINS:

  19        Q    Is that a different one?

  20        A    Yes, it is. This is closer to -- this is the

  21   carpeting (indicating). It would be the living room.

  22   And this would be where you are going down to the first

  23   floor (indicating). And next to the ruler, to the

```
 1         Q    It doesn't tell you when it was made, how

 2    it was made or any of that, does it?

 3         A    No, it does not.

 4         Q    And, in fact, of the unknown prints, you

 5    don't know who made the unknown prints, correct?

 6         A    That is correct.

 7         Q    That could have been Wes Warrington, could

 8    have been Andrew, correct?

 9         A    That's correct.

10         Q    It could have been Jesse Pecco?

11         A    That's correct.

12         Q    If a couple other witnesses said that they

13    walked through this, it could have been theirs?

14         A    That is correct.

15         Q    And I don't want to try to pin you down,

16    but with regard to the several unknown impressions,

17    were they in the 10's, 20's, 100's that you found?

18    How many unknown impressions, if you can venture a

19    guess?

20         A    I'd be afraid to even venture a guess,

21    because there was a lot of overlapping impressions.

22         Q    More than 50?

23         A    I would say 50 would be an accurate guess.
```

KATHY S. PURNELL
OFFICIAL COURT REPORTER

A- MANA 37

Original Occurrence Dates and Times:
ON 08/14/2000 1400 thru MON 08/14/2000 1413

Location:
100 PORT LEWES          LEWES, DE 19958
LIMITS OF LEWES
CR 19 (CAPE HENLOPEN DRIVE)

## Original Victim Information

| Victim Number 001 | Name PECCO, JESSE E | | | | | | |

| Type Individual | Sex Male | Race White | | | Ethnic Origin Non-Hispanic | Age 22 | D.O.B. 06/14/1978 |

| Address 200-31 VALLEY RUN APTS MILFORD, DE 199630000 | | Resident Status Full Time | Home Telephone (302) 424-0189 | Employer/School | | | Work Telephone |

| Reporting Person? ☐ Yes ☒ No | Victim Injured? ☐ Yes ☒ No | Victim Deceased? ☒ Yes ☐ No | Officer Comments | | | |

## Original Suspect/Defendant Information

| Sequence 001 | Type Suspect | SBI Number | Name WARRINGTON, ROBERT WESLEY | | | | Nick Name WES | |

| Sex Male | Race White | Ethnic Origin Non-Hispanic | Age 22 | D.O.B. 09/11/1977 | Height 6'01" | Weight 155 | Skin Tone Medium | Eye Color Blue |

| Hair Color Brown | Hair Length Short | Hair Style Straight | Facial Hair Other | Voice Speech | Teeth | Build Average | Glasses |

| Address 100 PORT LEWES LEWES, DE 19958 | | Home Telephone (302) 644-2567 | Employer/School | | | Work Telephone |

| Arrest Number | Suspect's Clothing Description | | | |

## Original Crime and Associated Information

| Victim Number 001 | Crime Seq 001 | Statute DE:11:0636:00a1:F:A | Crime Description Murder First Degree Intentionally Caused Death of Another Person | | |

| Motion Type sidence/Home | | Status Pending-Active | | Involvement ☐ Alcohol ☐ Drugs ☐ Computer | General Offense |

| Crime Code 090448 | Suspected Hate/Bias ☐ Yes ☒ No - N/A | Burglary Force Involved ☐ Yes ☐ No | Homicide Circumstance Criminal Killed By Private Citizen | |

## Investigative Narrative

SEE PAGE TWO FOR NARRATIVE